**In re Paul A. BILZERIAN, Debtor.**

**Rick BRANNELLY, Plaintiff,**

v.

**Paul A. BILZERIAN, Defendant.**

**Bankruptcy No. 91–10466–8P7.**
**Adv. No. 92–50.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 10, 1993.

**234**

William C. Ballard, Fisher & Sauls, P.A., St. Petersburg, FL, for plaintiff.

Paul A. Bilzerian, pro se.

## ORDER GRANTING MOTION FOR INVOLUNTARY DISMISSAL

ALEXANDER L. PASKAY, Chief Judge.

WHEN THE boys of summer are ready to march on the field of dreams, the body starts to pump adrenalin. The atmosphere is even more intense if the boys involved are members of a Little League. So long as the intensity and the spirit of competition remains on the field, no one really gets disturbed and that is what makes baseball exciting. However, when the intensity and heightened emotional level spills over to the refreshment stand and to the grand stand, problems start to brew and disputes and arguments between the adult players of this favorite national past-time may create a highly charged atmosphere which is likely to produce disputes which ultimately may end up in court. This is precisely what happened in the present instance.

The central player in this saga is Paul A. Bilzerian, (Bilzerian) a nationally renowned corporate raider who enrolled his son in a Tee-ball program of the Northeast Little League (Little League) in Pinellas County. It appears that at the beginning of 1987 season, Mrs. Brannelly, the wife of Rick Brannelly, the Plaintiff in this adversary proceeding, met Mr. Bilzerian who was attending the Tee-ball coaches' meeting. Mrs. Brannelly was in charge of fund raising, running the concession stand, sponsorship and producing the program for the Northeast Little League, and had been for the past four years. In her discussion with Bilzerian, they discussed the fund raising program for the upcoming season. It is without dispute that Bilzerian stated that if the participating teams were able to raise $5,000.00, he would match this amount and would make a contribution to the League in the same amount. On opening night, Mrs. Brannelly made an announcement of the fund raising, including the offer of Mr. Bilzerian to make a $5,000.00 matching contribution to the $5,000.00 raised by the League. Under this program, Mrs. Brannelly would, on behalf of the League, purchase, at a discount, various and sundry products from Cardinal Associates, Inc., (Cardinal). The Cardinal products were to be sold by the children playing on each team and the proceeds of the sales were to be divided as follows: Cardinal was to be paid 60% of the total sales and the League would keep 40%, although possibly 41%, from the proceeds of the products sold. Pursuant to this program, the League purchased products from Cardinal and was

billed $12,658.15 plus a 4% service charge (Plaintiff's Composite Exhibit No. 7).

It appears that at the conclusion of the season, Mrs. Brannelly requested that Bilzerian live up to his promise and donate the promised $5,000.00 to the League based on the contention that the program did produce a profit for the League in excess of the $5,000.00, the amount agreed upon. On December 10, 1987, Mrs. Brannelly wrote to Bilzerian and mailed to Bilzerian a computer printout from Cardinal together with a photocopy of the auxiliary bulletin which was distributed to the attendees at the closing ceremony in June. According to this letter, these documents were certified by the League president indicating that the League realized a profit based on the formula described earlier of $5,093.35 which, together with cash donations of $65.00, produced a profit for the League of $5,158.35 (Plaintiff's Exhibit 5). By this time the relationship between Bilzerian and the leadership of the League had seriously deteriorated primarily because of vocally expressed dissatisfaction by Bilzerian about the manner in which the program, especially the Tee-ball program, was conducted.

It appears that the original submission by Mrs. Brannelly indicated sales of only $11,973.15 which, under the formula, would have merely provided a profit of $4,371.18. In response to the submission by Mrs. Brannelly, Bilzerian demanded further documentation to establish that the fund raising program did in fact produce a profit of $5,000.00. Although the evidence is in dispute whether or not Bilzerian received the first submission, it is without dispute that he requested and received a second submission. According to the Plaintiff, the League received some additional invoices from Cardinal which brought the total gross sales to $12,658.15 (Plaintiff's Exhibit Number 5), of which the Little League actually paid to Cardinal the sum of $7,601.97. Be that as it may, this dispute was never resolved and Bilzerian never made the promised donation.

The intensity of the feelings spawned the events which ultimately produced this lawsuit filed by the Rick Brannelly, a member of the Board of Directors and First Vice President of the Little League during the 1987 season. It appears that the Plaintiff made several attempts to pressure Bilzerian to make the $5,000.00 donation and threatened to call the media to publicize the fact that Bilzerian reneged on his promise to pay the donation he promised to make if the Little League did achieve the $5,000.00 profit set as the prerequisite to furnishing the matching funds by Bilzerian. It is without dispute that on May 20, 1988, Brannelly called the St. Petersburg Times and spoke to a reporter and informed him that when the Little League tried to collect the promised donation from Bilzerian, "he welshed," and that Bilzerian charged that he was provided a double set of receipts showing that the $5,000.00 goal was in fact met. The St. Petersburg Times printed the interview in which it was stated, inter alia, that Bilzerian made an oral promise to make the $5,000.00 donation to the Little League and he reneged on his promise. In retaliation, Bilzerian wasted no time and filed a suit in the Circuit Court for Pinellas County, Florida, Case No. 88–3242 in which he charged that the statements made by Brannelly to the newspaper were false and unprivileged, publication of which injured him, and he sought a judgment for compensatory and punitive damages (Plaintiff's Complaint Exhibit 1). In due course Brannelly filed his Answer and also filed a Motion for Final Summary Judgment. On August 2, 1989, the Circuit Court granted the Motion and dismissed Bilzerian's complaint with prejudice (Plaintiff's Exhibit Number 2). Bilzerian, who at this time represented himself, filed a Notice of Appeal on September 1, 1989 (Plaintiff's Exhibit Number 3) and the Second District Court of Appeals on July 18, 1990 affirmed the decision of the Circuit Court per curiam (Plaintiff's Exhibit Number 4). On April 4, 1991, Brannelly filed a suit for malicious prosecution against Bilzerian in the Circuit Court of Pinellas County, Florida, Case No. 91–5490–13 in which he sought compensatory and punitive damages in excess of $2.6 million. This suit is still pending.

On August 5, 1991, Bilzerian filed his original Petition for Relief under Chapter 11 of the Bankruptcy Code. However, on October 22, 1991, the Chapter 11 case was converted to a Chapter 7 liquidation case. On January 23, 1993, Brannelly filed his complaint and sought a determination that by reason of the conduct of Bilzerian by filing the suit in the Circuit Court of Pinellas County, he was injured as a result of Bilzerian's willful and malicious conduct and, therefore, Bilzerian is not entitled to have this unliquidated debt owed to him protected by the overall general discharge by virtue of Section 523(a)(6) of the Code. The claim of non-dischargeability of this Section provides:

§ 523. Exceptions to Discharge.

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

(6) for a willful and malicious injury by the debtor to another entity or to the property of another entity.

It should be noted at the outset that the discharge provisions of the Bankruptcy Code are meant to provide the Debtor with a new opportunity and an unencumbered field for future business enterprises and other activities which are unhampered by continuing debts. See *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). As a result, the exceptions to discharge set forth in Section 523 should be construed strictly against the creditor and liberally in favor of the Debtor. It is further well established that the burden of proof in a nondischargeability action is on the Plaintiff but the standard of proof to meet the burden is no longer clear and convincing but merely preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

To prevail under Section 523(a)(6), a Plaintiff must prove that the Debtor did commit willful and malicious injury against the Plaintiff. The term "willful" has been defined as "deliberate and intentional." *In re Scotella*, 18 B.R. 985, 977 (Bankr. N.D.Ill.1982); *In re Keen*, 135 B.R. 162 (Bankr.S.D.Fla.1991). For the act to be malicious, it must result in an injury aris-ing from a willful act done wrongfully and without just cause or excuse. See *In re Greer*, 21 B.R. 763 (Bankr.D.Ariz.1982).

The Plaintiff heavily relies on the fact that Bilzerian is a public figure and, therefore, under the well established doctrines enunciated by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), whereby a public figure is basically free game and has no viable claim against a publication unless the publication contains material facts which are false and it was published as true with knowledge of the falsity with the intent to injure or defame. The reliance of the Plaintiff on the "public figure" doctrine is misplaced. The suit filed in the Circuit Court by Bilzerian was not an action against the newspaper but against Brannelly, thus the suit did not involve the "public figure doctrine" but was governed by the First Amendment. But whether or not the suit filed by Bilzerian was totally without merit and unfounded and was for the sole purpose of intentionally injuring Brannelly, which conduct might fall within the scope of the exception to discharge set forth in Section 523(a)(6) of the Bankruptcy Code, remains for this Court's determination.

Based on this record, the most that could be said is that the evidence at most is in equilibrium and equally consistent with the contention of the Plaintiff that the suit filed by Bilzerian was totally baseless and also with the proposition that Bilzerian was justified to file the lawsuit. In this connection, it should be pointed out that it is clear from this record that Brannelly contacted the newspaper and made the allegations set forth in the article for the sole purpose to coerce Bilzerian to make the donation he promised to make. Thus, while the action of Brannelly might not have technically been extortion in a legal sense, i.e. a felony, it certainly borders on extortion simply because the threat was clearly made for the sole purpose of extorting and coercing Bilzerian to live up to his promise and to make the donation. Thus the conduct by Brannelly falls mighty close to the defini-

tion of the term "coercion." *See Black's Law Dictionary, Abridged Fifth Edition, 1983, page 302.*

Be that as it may, it is clear that even under the relaxed standard of proof established by the Supreme Court in *Grogan v. Garner, supra*, this evidence lacks sufficient strength to establish a viable claim under Section 523(a)(6) and, therefore, the Motion for Involuntary Dismissal made by Bilzerian pursuant to F.R.B.P. 7041(b) is well taken and should be granted.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion for Involuntary Dismissal be, and the same is hereby, granted. It is further

ORDERED, ADJUDGED AND DECREED that the above-captioned adversary proceeding be, and the same is hereby, dismissed with prejudice.

DONE AND ORDERED.